**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------- X
SUSANNE SCHAFMEISTER,                           :
                                                :      Civil Case No.:
                              Plaintiff,         :
                                                :      **COMPLAINT**
              v.                                :
                                                :      **Jury Trial Demanded**
NYU LANGONE HOSPITALS and John                  :
Kennedy, M.D., in his individual and professional :
capacities,                                     :
                                                :
                              Defendants.        :
------------------------------------------------------------- X

Plaintiff Susanne Schafmeister hereby alleges as follows:

**PRELIMINARY STATEMENT**

1.      In early 2019, NYU Langone Hospitals ("NYU Langone" or the "Hospital") hired Dr. John Kennedy, a world-renowned orthopedic surgeon, to head its brand-new Foot and Ankle Center (the "Center").  NYU Langone was relying on Dr. Kennedy to raise the profile of its orthopedics practice and agreed to pay him a substantial sum to do so.

2.      Thus, it might come as no surprise that when NYU Langone learned that Dr. Kennedy had engaged in outrageous discriminatory, harassing and threatening behavior towards Ms. Schafmeister, his office manager, it decided to take every possible step to protect Dr. Kennedy and subjected Ms. Schafmeister to blatant and unconscionable retaliation.

3.      Indeed, on or about October 11, 2019, Ms. Schafmeister made a formal complaint about Dr. Kennedy to NYU Langone's Human Resources ("HR") department; specifically, to Kathleen Pacina, the Hospital's Employee & Labor Relations Manager.  Ms. Schafmeister complained that Dr. Kennedy – who previously had a personal relationship with Ms.

Schafmeister – began subjecting her to egregious and frightening threats and harassment shortly after the dissolution of their relationship.

4.      Ms. Schafmeister then made additional follow-up complaints to HR when Dr. Kennedy's conduct escalated and he began retaliating against Ms. Schafmeister.  Among the many things that Ms. Schafmeister complained to HR about are the following:

- Dr. Kennedy hired private detectives to follow Ms. Schafmeister.  To facilitate this harassing conduct, Dr. Kennedy directed Dr. Ashraf Fansa – who worked for the Hospital for Special Surgery ("HSS") but was paid through Dr. Kennedy's NYU Langone discretionary research fund – to demand that another doctor, Dr. Yoshi Shimozono, notify his private detective the moment that Ms. Schafmeister left work. ***Ms. Schafmeister provided text message proof of this conduct to HR.***  <u>See</u> also, *infra* at ¶ 90 for a copy of the text message.

- Dr. Kennedy hid recording devices in at least one conference room in order to record multiple conversations that Ms. Schafmeister had at NYU Langone.  ***HR was provided video evidence of this.***

- Dr. Kennedy made numerous harassing comments to Ms. Schafmeister about her new boyfriend.

- Dr. Kennedy forced Ms. Schafmeister to converse with him, in the workplace, about the details of their personal relationship and the end thereof.

- Dr. Kennedy forced staff members who were "connected" with Ms. Schafmeister on social media to hand over their phones so that he could view Ms. Schafmeister's social media postings.

- Dr. Kennedy repeatedly demanded, during the workday, that Ms. Schafmeister return every gift he has given her.

- Dr. Kennedy threatened to enter Ms. Schafmeister's apartment to retrieve the gifts he had previously given her.

- Dr. Kennedy made Ms. Schafmeister fear for her physical safety.

2

- Dr. Kennedy repeatedly threatened to have Ms. Schafmeister terminated.

- Dr. Kennedy repeatedly opened and searched through Ms. Schafmeister's desk drawers.

- During the HR "investigation" into Ms. Schafmeister's initial complaints, Dr. Kennedy engaged in brazen and open witness intimidation against multiple employees.  By way of example only, immediately prior to his interview with HR, Dr. Shimozono was directed into a meeting with Dr. Kennedy.  When Dr. Shimozono arrived at the meeting, Dr. Kennedy was present with his personal lawyer and a third party.  Dr. Kennedy directed Dr. Shimozono to sign a non-disclosure agreement in an attempt to prevent him from communicating with HR about Ms. Schafmeister.   Dr. Shimozono was visibly shaken and scared for his wellbeing.  **HR was provided video evidence of this meetings.**

5.     In addition to all of the above, Dr. Kennedy repeatedly threatened to have Ms. Schafmeister arrested, prosecuted on bogus charges and deported (Ms. Schafmeister is a legal resident, but not a citizen) and demanded that she withdraw her HR complaint.

6.     When Ms. Schafmeister resisted and complained about his unlawful behavior, Dr. Kennedy made crystal clear that he would punish her for doing so.  In one message – shared with NYU Langone's HR team – Dr. Kennedy wrote, *inter alia*,

> I am really baffled by **why you want to go to war with me Susanne.** I am not your enemy, but if you continue to be adversarial I can behave that way also.  Your lawyer pal will tell you that there is no legal way you can win anything here **and in the end you will hurt yourself way more than me.**

7.     On another occasion, right after Ms. Schafmeister filed her complaint with HR, Dr. Kennedy threatened to report Ms. Schafmeister "to the feds."  All of the above was told to NYU Langone, including the threat that Dr. Kennedy would have Ms. Schafmeister arrested and attempt to have her deported in the event she pursued her complaint.

3

8.      There is no question that the foregoing conduct is not only illegal, but also twisted and frightening.  NYU Langone was on notice of this conduct – *and even had text message and video evidence to corroborate the claims* – yet, NYU Langone took zero timely remedial action.

9.      NYU Langone was fully aware that Ms. Schafmeister was being stalked by Dr. Kennedy's private detective, and that Dr. Kennedy was openly threatening potential witnesses in connection with the Hospital's HR "investigation," and yet Ms. Schafmeister was forced to continue to work in the same office as Dr. Kennedy.

10.     Ms. Schafmeister stated explicitly and in writing to HR that she was concerned about her physical safety at work, and NYU Langone did nothing.

11.     In fact, when, on November 12, 2019, Ms. Schafmeister reiterated to Ms. Pacina that she was concerned about her safety at work, Ms. Pacina flippantly responded, "you are not my only case that matters and I will pursue this as is feasible."  In other words, despite *all of the above*, Ms. Pacina essentially told Ms. Schafmeister, "I'll get to it when I get to it."  In no world is this even remotely acceptable.

12.     NYU Langone's apathy in connection with this extremely serious situation only emboldened Dr. Kennedy.  On November 18, 2019, as Ms. Schafmeister predicted and conveyed to NYU Langone weeks prior, Ms. Schafmeister was arrested and charged in a felony complaint based on completely concocted allegations of embezzlement.  Moreover, an order of protection was issued against Ms. Schafmeister that prohibited her from going anywhere near Dr. Kennedy or his place of work.  Thus, she was unable to even go to NYU Langone, much less work there.

13.     NYU Langone, and Ms. Pacina in particular, were fully aware of Ms. Schafmeister's arrest and the issuance of the order of protection.  Nevertheless, in an

4

unbelievably outrageous move, Ms. Pacina directed Ms. Schafmeister *to come to NYU Langone*

*to answer questions that would obviously be relevant to the pending criminal charges.*

14.     Ms. Schafmeister responded to this request as follows:

> I have made repeated complaints about Dr. Kennedy's erratic, harassing and threatening behavior. I explained to you that I had a past relationship with him, and that he began harassing me at work because I ended my personal relationship with him. I showed you evidence that he has had detectives follow me around, recorded my conversations and threatened witnesses. I also told you that his behavior towards me and his own work has put the health and safety of our patients at risk. I said that Dr. Kennedy repeatedly threatened to have me arrested on false charges of embezzlement if I did not comply with his demands and withdraw my HR complaint.

> You and NYU have done literally nothing to assist me in response to my complaints. I was forced to continue to go to work with Dr. Kennedy, despite the fact that you were fully on notice of his discriminatory, retaliatory and downright frightening behavior. Yesterday, as I predicted and told you, I was arrested on bogus charges of embezzlement. The judge also issued a restraining order, and I cannot come to NYU without violating it. I also cannot discuss this matter with you given the pending criminal charges. I will follow up as soon as I can.

> I truly believe this all could have been avoided if you had simply properly responded to my complaints.

15.     Incredibly, Ms. Pacina, who is not a lawyer, never mind a criminal defense

lawyer, responded by again attempting to convince Ms. Schafmeister to attend a meeting at NYU

Langone.

16.     On November 25, 2019, Ms. Schafmeister put NYU Langone on notice of her

decision to retain counsel. Ms. Schafmeister's attorneys, Wigdor LLP ("Wigdor"), explained to

the Hospital's in-house counsel, Daniel Driesen, Esq., that, although Ms. Schafmeister was able

to have the order of protection modified such that she could return to work, Ms. Schafmeister

could not sit for an interview with NYU Langone's HR team given the pending criminal charges.

17.     Wigdor also explained that Ms. Schafmeister had already provided ample evidence and would be happy to respond to written questions directed through counsel.

18.     Despite this overture, NYU Langone, intent on continuing to harass Ms. Schafmeister, repeatedly contacted her directly to attempt to set up another interview.

19.     When Wigdor again explained that this would not be possible, HR sent a list of highly personal and inappropriate written questions directly to Ms. Schafmeister, including questions asking for the dates and locations of certain occasions during which Ms. Schafmeister and Dr. Kennedy had been "intimate" together.  What is worse, ***HR told Ms. Schafmeister that she must answer the questions without consulting with her legal counsel.***

20.     NYU Langone must cease its brazen retaliatory conduct immediately.  To that end, Ms. Schafmeister unfortunately has been left with no choice but to file this action for declaratory, injunctive and equitable relief, as well as monetary damages, to redress unlawful employment practices committed against her in violation of Title IX of the Education Amendments Act of 1972, 20 U.S.C. §§ 1681 *et seq*. ("Title IX"), the New York State Human Rights Law, N.Y. Exec. Law §§ 290 *et seq*. ("NYSHRL"), the New York City Human Rights Law, N.Y.C. Admin. Code §§ 8-101 *et seq*. ("NYCHRL") and the New York Labor Law §§ 190 *et seq*., as well as to redress violations of New York State common law.

## ADMINISTRATIVE PROCEDURES

21.     Following the filing of this Complaint, Plaintiff will file a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* ("Title VII"). When the EEOC issues Plaintiff's notice of right to sue, she will seek leave to amend this Complaint to add claims for Defendant NYU Langone's violations of Title VII.

22.     Pursuant to NYCHRL § 8-502, a copy of the original Complaint will be served upon the New York City Commission on Human Rights and the New York City Law Department, Office of the Corporation Counsel, within ten days of its filing, thereby satisfying the notice requirements of that section.

23.     Any and all other prerequisites to the filing of this suit have been met.

## JURISDICTION AND VENUE

24.     The Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343, as this action involves federal questions regarding the deprivation of Plaintiff's rights under Title IX.  The Court has supplemental jurisdiction over Plaintiff's related claims arising under New York State and New York City law pursuant to 28 U.S.C. § 1367(a).

25.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) and (c) because Defendant NYU Langone Hospitals is headquartered within the Southern District of New York, and a substantial part of the events or omissions giving rise to this action, including the unlawful practices alleged herein, occurred in this district.

## PARTIES

26.     Plaintiff Susanne Schafmeister is the Manager of Operations at NYU Langone's Foot and Ankle Center.  Ms. Schafmeister currently resides in New York County, New York and is a permanent resident of the United States.

27.     Defendant NYU Langone Hospitals is a medical facility owned by New York University, a non-profit university that receives federal and state funding.  NYU Langone Hospitals' principal place of business is in New York County, New York.  NYU Langone Hospitals is responsible for the welfare, education and safety of students, faculty and staff.

28.     Defendant John Kennedy, M.D. is an orthopedic surgeon and Professor in NYU Langone Hospitals' Department of Orthopedic Surgery.  Defendant John Kennedy, M.D. was, at all relevant times, Plaintiff's supervisor at NYU Langone Hospitals.  At all relevant times herein, Defendant Kennedy was Plaintiff's "employer" under all relevant statutes.

## FACTUAL ALLEGATIONS

### I.     Background

29.     Ms. Schafmeister was born and raised in Germany and holds a Master of Science in Psychology and Linguistics from Bielefeld University ("Bielefeld").

30.     Following her graduation from Bielefeld, Ms. Schafmeister spent four years working at Fielmann AG ("Fielmann") – an $800 million optical industry leader located in Hamburg, Germany – as a HR trainer, Senior Management Coach and Recruitment Manager.

31.     Following her time at Fielmann, from 2005 through February 2007, Ms. Schafmeister performed various roles at Chopard USA Ltd. ("Chopard") and American Wempe Corp., two international luxury goods companies located in Geneva, Switzerland and Hamburg, Germany, respectively.

32.     In 2005, just as she began working for Chopard, Ms. Schafmeister moved to the United States.

33.     Shortly after moving to the United States, Ms. Schafmeister met Dr. Kennedy, an orthopedic surgeon with a successful private practice and an affiliation at HSS.

34.     Over the following year, Ms. Schafmeister and Dr. Kennedy began to spend more time together, and eventually a romantic relationship developed between the two.  Ms. Schafmeister moved into Dr. Kennedy's New York City apartment and became extremely close with his parents and two sons (from a prior marriage).

35.     After dating for approximately one year, Dr. Kennedy offered Ms. Schafmeister a position as the Operations Manager of his private practice.

36.     Ms. Schafmeister was initially apprehensive and was not sure that she wanted to work for Dr. Kennedy while living with him and maintaining a romantic relationship.  However, Dr. Kennedy eventually prevailed on Ms. Schafmeister and, in March 2007, she began working for him at HSS.

37.     From that time until early 2018, Ms. Schafmeister proved herself to be a superb Operations Manager for Dr. Kennedy.  Ms. Schafmeister was responsible for developing business plans and managing Dr. Kennedy's practice, including overseeing daily operations and implementing policies and procedures.  In no small part due to Ms. Schafmeister's hard work, Dr. Kennedy's practice became extremely financially successful, bringing in millions of dollars per year.

38.     Meanwhile, in the spring of 2015, Ms. Schafmeister began looking for an apartment of her own.  She found one on Mercer Street (the "Mercer Street Apartment").  However, she would not have been able to secure a mortgage for the apartment on her own.  Thus, Dr. Kennedy suggested that she put the apartment in his name to secure the mortgage.  Ms. Schafmeister paid (through Dr. Kennedy) a large portion of the down payment on the apartment and, over the following years, the monthly mortgage and maintenance payments.  Ms. Schafmeister also contributed a substantial amount of money to renovating the Mercer Street Apartment.

39.     In order to make these payments, Ms. Schafmeister depleted her 401(k) account and incurred significant penalties as a result.

40.     Dr. Kennedy promised to transfer title of the apartment over to Ms. Schafmeister once the mortgage was paid off.  Ms. Schafmeister never would have depleted her 401(k) or made payments for the down payment, mortgage and maintenance had Dr. Kennedy not promised to transfer title to Ms. Schafmeister.

41.     By early 2018, Dr. Kennedy had decided that, beginning in 2019, he would move his practice to NYU Langone and become an employee of the Hospital.  Dr. Kennedy told Ms. Schafmeister that he needed to expense as much as he possibly could to his private practice in its last year of operation.  He also told Ms. Schafmeister that, as a "bonus" in consideration for her years of dedicated service, she should write checks from the bank account of his private practice to pay off various personal credit card bills.

42.     It came as little surprise to Ms. Schafmeister that Dr. Kennedy advised her to make these payments.  Indeed, she had been unquestionably underpaid for years – a fact that Dr. Kennedy conceded.  Moreover, Dr. Kennedy had provided Ms. Schafmeister with various expensive gifts over the years, including, *inter alia*, tens of thousands of dollars' worth of jewelry and art.

43.     To be clear, at all times Dr. Kennedy authorized and knew that Ms. Schafmeister was using the business account for these purposes.  Dr. Kennedy also had (and still has) a meticulous accountant who contemporaneously tracks expenditures and kept Dr. Kennedy abreast of all account activity.

44.     Unfortunately, by the end of 2018, the romantic relationship between Ms. Schafmeister and Dr. Kennedy had soured owing to various lies and deceitful conduct on his part.  Specifically, Ms. Schafmeister learned that Dr. Kennedy had multiple other girlfriends and had even married one of these girlfriends, all while dating Ms. Schafmeister.  As to the latter, Dr.

Kennedy told Ms. Schafmeister that he married another woman because she had terminal cancer and her "dying wish" was to marry him.  However, Ms. Schafmeister later learned that was not true.  Dr. Kennedy also regularly lied to Ms. Schafmeister and told her he was attending business trips or visiting his dying father when he was, in fact, going on extravagant vacations with other women.

45.     Ultimately, by the end of 2018, Ms. Schafmeister decided that she would end her romantic relationship with Dr. Kennedy.

**II.     Ms. Schafmeister and Dr. Kennedy Join NYU Langone**

46.     Meanwhile, by early 2018, Dr. Kennedy was being courted by NYU Langone to join the Hospital as the Director of the Center and Chief of Joan H. & Preston Robert Tisch Center Essex Crossing's Foot and Ankle Department.

47.     During his negotiations with NYU Langone, Dr. Kennedy made it abundantly clear that he would not join NYU Langone unless NYU Langone also hired Ms. Schafmeister. Dr. Kennedy explained that Ms. Schafmeister was an essential part of his business, and he would not be successful without her.  Obviously, he would not have done this if Ms. Schafmeister was embezzling money from him.

48.     Ms. Schafmeister was understandably hesitant to continue working with Dr. Kennedy after the breakup of their personal relationship.  However, Ms. Schafmeister still cared for Dr. Kennedy as a friend, and was very close with many members of his family.

49.     Recognizing the career benefits of working for NYU Langone, and with the expectation that Dr. Kennedy would remain professional, she decided to join him at NYU Langone.

50.     Initially, NYU Langone offered Ms. Schafmeister a position as the Center's Revenue Cycle Manager at a salary of $130,000.  However, Ms. Schafmeister was uncomfortable with this arrangement because it would require a pay cut from her days working at Dr. Kennedy's private practice.  Thus, she negotiated a guaranteed bonus that was memorialized in writing by William Runkle, the Administrator of the Hospital's Department of Orthopedics.

51.     Specifically, on December 18, 2018, Mr. Runkle sent an email to Ms. Schafmeister that reads as follows:

> Hi Susanne,
>
> This email should serve to formally offer you a position as Revenue Cycle Manager with the Department of Orthopedic Surgery working with Dr. John G. Kennedy for a total compensation amount of $144K annually.  This will be made up from an offer of $130K from NYU Langone Human Resources and the additional $14K annually will be paid to you using an alternative mechanism through Dr. Kennedy's foundation (or something similar).  Additional salary or bonus amounts are still to be determined and I will notify you once a final decision/plan has been made.  Please let me know if you have any questions/concerns.
>
> Thanks - Will

52.     Dr. Kennedy also assured Ms. Schafmeister that he would pay her the aforementioned $14,000 at some point during the summer of 2019.

53.     Based on these representations, Ms. Schafmeister accepted the position at NYU Langone.

## III.     Dr. Kennedy Subjects Ms. Schafmeister to Pervasive Harassment, Discrimination and Retaliation, Including a Baseless Threat to File Criminal Charges Against Her

54.     Unfortunately, it soon became clear that Dr. Kennedy had not come to terms with Ms. Schafmeister's decision to end their personal relationship, and he began subjecting Ms.

Schafmeister to discriminatory harassment and retaliation in the workplace for her decision to end the relationship.

55.     This conduct included wild and erratic mood swings.  One day Dr. Kennedy would be perfectly friendly, and the next he would berate Ms. Schafmeister, scream and yell at her and subject her to circular conversations in the workplace regarding personal matters and the end of their relationship.

56.     By way of example only, even though Ms. Schafmeister worked for NYU Langone, Dr. Kennedy continued to ask Ms. Schafmeister to help him with his personal affairs, such as managing his personal travel plans, paying his personal bills and coordinating his housekeepers' schedules.  Also by way of example, Dr. Kennedy continued to ask Ms. Schafmeister to assist him in closing down his previous private practice.  Ms. Schafmeister told Dr. Kennedy that she did not believe these tasks were appropriate, but he did not listen and became extremely angry when Ms. Schafmeister complained about having to attend to his personal needs.

57.     The conduct was only exacerbated in the spring of 2019 following Ms. Schafmeister's disclosure to Dr. Kennedy that she had started dating another man.

58.     Dr. Kennedy became seemingly obsessed with Ms. Schafmeister's new boyfriend and started taking measures to learn more about her dating life.

59.     By way of example only, Dr. Kennedy directed and required Ms. Schafmeister's coworkers to log into their personal Instagram and other social media accounts and hand over their phones to show Dr. Kennedy pictures of Ms. Schafmeister with her new boyfriend.

60.     Dr. Kennedy was also seen rifling through Ms. Schafmeister's desk, including looking through her personal items and removing her belongings.

61.    Dr. Kennedy also became extremely aggressive towards Ms. Schafmeister at work, and would reprimand her, deny her vacation requests, assign her near-impossible tasks and bring up her dating life during irrelevant and inappropriate times.  Dr. Kennedy also threatened to have Ms. Schafmeister fired on numerous occasions.

62.    In addition, Dr. Kennedy repeatedly pressured Ms. Schafmeister to talk about their previous romantic relationship, including how and why it ended.

63.    Dr. Kennedy also made anti-Semitic remarks about Ms. Schafmeister's new boyfriend.

64.    In or around June 2019, Ms. Schafmeister reached out to Eric Schips, the new Administrator for the Department of Orthopedic Surgery at NYU Langone, about the bonus compensation that she was promised when she accepted the job with NYU Langone.

65.    Mr. Schips responded by stating that NYU Langone was changing its bonus system and that, despite NYU Langone's prior written assurances, Ms. Schafmeister was not guaranteed to receive a bonus that summer.

66.    Dr. Kennedy was out of the country at the time, so Ms. Schafmeister called him for advice on how to proceed.

67.    After explaining the situation, Dr. Kennedy angrily and jealously responded, **"Can't you just ask your new boyfriend for money?"**

68.    Ms. Schafmeister was completely taken aback.  She calmly told Dr. Kennedy that she is financially independent and does not rely on her boyfriend for money, and that his comments were completely inappropriate.

69.    Dr. Kennedy then told Ms. Schafmeister that he did not have money is his foundation's account, but that there was some money left in his private practice's business

accounts.  Dr. Kennedy instructed Ms. Schafmeister to write herself a $12,000 check from the private practice's business account to herself in consideration of her guaranteed bonus.

70.     Ms. Schafmeister knew that Dr. Kennedy had paid for another NYU Langone employee's bonus of approximately $5,000 out of the same account and, based on Dr. Kennedy's direction, wrote the $12,000 check.

71.     One week later, apparently prompted by an email from his accountant about the check, Dr. Kennedy called Ms. Schafmeister.  Screaming and laughing at her in a disturbing and erratic manner, Dr. Kennedy feigned that Ms. Schafmeister had written the check without authorization and yelled, "now I've finally got you.  You have committed a felony and I will report you to the feds.  You will end up behind bars and I will have you deported."  Dr. Kennedy also told Ms. Schafmeister, "I don't give a shit if you end up with your two dogs on the streets." These were clear discriminatory and retaliatory threats to file a bogus complaint with the police and see Ms. Schafmeister evicted from the Mercer Street Apartment.

72.     Dr. Kennedy then demanded that Ms. Schafmeister wire $10,000 back to his private practice's account (despite claiming that the money was stolen, he "allowed" Ms. Schafmeister to keep $2,000), and said that if she did not, he would "call the authorities."  Ms. Schafmeister was absolutely terrified and made the wire transfer that very same day.

73.     Dr. Kennedy was clearly acting out of jealousy because Ms. Schafmeister was now dating another man.

**IV.     Dr. Kennedy Intensifies His Discriminatory, Harassing and Retaliatory Conduct**

74.     As she was financially dependent on her job and had a long history with Dr. Kennedy, Ms. Schafmeister continued to go to work and attempted to maintain a professional

and even friendly relationship with Dr. Kennedy.  She also attempted to appease him so as not to incur his wrath and abuse yet again.  Unfortunately, this proved to be impossible.

75.     In August 2019, Dr. Kennedy approached Ms. Schafmeister while at work and demanded that she return all of the personal gifts he had purchased for her over the years that they were together.  Dr. Kennedy stated that he needed her to return the gifts so he could sell them to raise funds for construction on his pool house.

76.     Ms. Schafmeister told Dr. Kennedy that he was making her very uncomfortable and that it was inappropriate for him to be discussing personal items with her at work.  She also told Dr. Kennedy that although the items he requested were gifts given to her, she would work with him to have the items returned.

77.     Over the course of the following weeks, Dr. Kennedy continued to harass Ms. Schafmeister about returning the gifts.  Ms. Schafmeister assured Dr. Kennedy that the gifts would be returned and invited a third party to retrieve them from her apartment.

78.     Instead, on September 30, 2019, Dr. Kennedy sent Ms. Schafmeister a message demanding that she create an "inventory" of the gifts that she was going to return to him.

79.     Ms. Schafmeister told Dr. Kennedy that creating an inventory would be unnecessarily onerous and confirmed that the third party could retrieve the items from her apartment.

80.    The next day, Dr. Kennedy continued to harass Ms. Schafmeister and refused to have the items picked up until she created an inventory for him.  He threatened:

> I am really baffled by why you want to go to war with me Susanne. I am not your enemy but **if you continue to be adversarial I can behave that way also.**  Your lawyer pal[1] will tell you that there is no legal way you can win anything here and **in the end you will hurt yourself way more than me.**  I'm asking you to please do the right thing for once.  I'm trying to be reasonable but everything you do is pushing me towards a situation that is unworthy of you.  Just make sure all my possessions are returned.  Once we have agreed upon the list they will be collected and at that point we can sign a short term lease or whatever you like for the flat.  Please please please I urge you **don't pick a fight with me Susanne.**  Neither of us will win so do the right thing and make sure my belongings are given back.  I have given you so much over the years it's beyond accounting and for you to do this is insane.  We have documented checks that you used to pay off your loans.[2]  Tell whoever is advising you the complete picture and reflect what an expose of all this would do to you.

81.    Despite knowing very well that the gifts were ready for pickup, Dr. Kennedy messaged Ms. Schafmeister again on October 2, 2019.  He also spent a portion of his day rummaging through Ms. Schafmeister's desk drawers and documents.

82.    On October 3, 2019, Dr. Kennedy again followed up on the gifts.  In response, Ms. Schafmeister again stated that the gifts were ready for pickup, but that she would not create an inventory for him.  Dr. Kennedy threatened to enter the Mercer Street Apartment himself to take the items.  He followed this up by telling Ms. Schafmeister that he would be selling the

---

[1]    This was a reference to Ms. Schafmeister's boyfriend, further demonstrating the discriminatory animus behind Dr. Kennedy's threats.

[2]    This was a reference to the authorized payments described *supra*.  Of course, despite insinuating that these payments were not authorized, Dr. Kennedy failed to take any action until after Ms. Schafmeister complained to NYU Langone's HR team, as described *infra*.

apartment (for which she had paid a large portion of the down payment and all the mortgage and maintenance payments) and that she should find a new place to live.

83.     Ms. Schafmeister requested, at a minimum, that if Dr. Kennedy was going to sell the Mercer Street Apartment, he return the down payment, mortgage and maintenance payments that she had made to him.

84.     To date, Dr. Kennedy has not paid Ms. Schafmeister her deposit, mortgage or maintenance payments.  Moreover, he repeatedly stated that he would only return the monies to Ms. Schafmeister if she would agree to withdraw an HR complaint she had filed against him (as described below).

**V.     Ms. Schafmeister Reports Dr. Kennedy's Conduct to Human Resources**

85.     On or about October 11, 2019, Ms. Schafmeister made a formal complaint about Dr. Kennedy to NYU Langone's HR department.  Ms. Schafmeister complained that Dr. Kennedy began subjecting her to egregious and frightening threats and harassment shortly after the dissolution of their relationship.

86.     On or about October 15, 2019, Ms. Schafmeister had a follow-up call with HR during which she provided additional details concerning Dr. Kennedy's discriminatory conduct. This call was made from a conference room at the Center.

87.     Almost immediately after Ms. Schafmeister ended the call, Dr. Kennedy stormed into the conference room and began screaming at Ms. Schafmeister.  He told Ms. Schafmeister that reporting him to HR was a "very bad idea."  He also told Ms. Schafmeister that in the event she refused to drop her HR complaint, he would report her to the "feds" and claim (falsely) that she had embezzled money from him.

18

88.     Ms. Schafmeister was terrified and shocked, and had no idea how Dr. Kennedy apparently listened in on her telephone call with HR.  As she later learned, Dr. Kennedy and others supporting him had apparently hidden a recording device in at least one conference room at the Center in order to record multiple conversations that Ms. Schafmeister had at NYU Langone.  Ms. Schafmeister reported this to HR, and HR was provided video evidence of this.

89.     Putting aside the frightening nature of this conduct, it also presents massive HIPAA and compliance concerns, as patient information is regularly discussed in the Center's conference rooms.  Moreover, one of the individuals who was assisting Dr. Kennedy with this harassing conduct, Dr. Ashraf Fansa – who worked for HSS  but was paid by Dr. Kennedy's NYU Langone discretionary research fund – should never have had access to any recordings taken in the Center's conference rooms (not that any should have been taken to being with).

90.     Even more frightening, Ms. Schafmeister subsequently learned that Dr. Kennedy was having her followed by a private detective.  In order to accomplish this, Dr. Kennedy directed Dr. Fansa to demand that another doctor, Dr. Yoshi Shimozono, notify his private detective the moment that Ms. Schafmeister left work.  This request was contained in a text message, a copy of which is below:



91.    After learning that Dr. Kennedy hired an investigator to track her movements, Ms.

Schafmeister reported this conduct to HR as well as Dr. Kennedy's other harassment to date.

92.    In addition, during the HR "investigation" into Ms. Schafmeister's complaints,

Dr. Kennedy engaged in brazen and open witness intimidation against multiple employees.  By

way of example only, immediately prior to his interview with HR, Dr. Shimozono was directed

into a meeting with Dr. Kennedy.  When Dr. Shimozono arrived at the meeting, Dr. Kennedy

was present with his personal lawyer and a third party.  Dr. Shimozono was directed to sign a

non-disclosure agreement in an attempt to prevent him from communicating about Ms.

Schafmeister with HR.  Dr. Shimozono was visibly shaken and scared for his wellbeing.  **HR**

**was provided video evidence of these meetings.**

93.     When complaining about Dr. Kennedy's harassing conduct, Ms. Schafmeister made it clear that she was concerned about her safety and was petrified that Dr. Kennedy would have her arrested on false charges as per his previous threats.

94.     In addition, Ms. Schafmeister was so scared that Dr. Kennedy would break into her home and hurt her that she moved out of the Mercer Street Apartment.

95.     HR did nothing to address Ms. Schafmeister's concerns.

96.     When Ms. Schafmeister followed up with Ms. Pacina of HR a few days later, she flippantly responded, "**you are not my only case that matters and I will pursue this as is feasible.**"

97.     Meanwhile, Dr. Kennedy began circulating rumors and making defamatory statements about Ms. Schafmeister.

98.     Dr. Kennedy told numerous staff members, fellows, residents and physicians that Ms. Schafmeister committed embezzlement and that he would be reporting her to "**the feds**" to have her deported.

99.     HR did nothing.

**VI.     Dr. Kennedy Makes Good on His Threats**

100.     After Dr. Kennedy made multiple failed attempts to coerce Ms. Schafmeister to rescind her complaints, he finally made good on his threats.

101.     On November 18, 2019, Ms. Schafmeister was arrested and charged with a felony based on Dr. Kennedy's false statements to the New York Police Department ("NYPD") that she had stolen money from him.  As explained herein, at no time did Ms. Schafmeister *ever* write a check from Dr. Kennedy's private practice account to herself without his authorization.

102.     Because of Dr. Kennedy's false complaint, the NYPD went to Ms. Schafmeister's home, arrested her and brought her to jail.

103.     Dr. Kennedy also requested that an order of protection be issued in his favor against Ms. Schafmeister and told the NYPD that he feared for his safety.[3]

104.     Dr. Kennedy clearly made this request to the NYPD with the intent of preventing Ms. Schafmeister from returning to work, and knew full well that Ms. Schafmeister would not be able to return to NYU Langone if an order of protection was in place.

105.     Indeed, the day after Ms. Schafmeister was arrested – before she even had the opportunity to contact NYU Langone to explain what had happened – Dr. Kennedy began telling Ms. Schafmeister's coworkers that she no longer worked at NYU Langone and that she had been arrested.

106.     NYU Langone, without consulting Ms. Schafmeister, removed Ms. Schafmeister's personal belongings from her workspace and cleared her desk as if she had been terminated.

107.     Moreover, upon information and belief, NYU Langone employees have logged into Ms. Schafmeister's personal email account (through her work computer) to review her emails.

## VII.    NYU Langone Further Retaliates Against Ms. Schafmeister and Seeks to Cover its Tracks

108.     More than one month after Ms. Schafmeister made her initial complaint, and only after Ms. Schafmeister was arrested and had criminal charges filed against her, HR requested a follow-up interview with Ms. Schafmeister.

---

[3]     Dr. Kennedy is over six feet tall and is significantly larger than Ms. Schafmeister.

109.    On November 19, 2019, Ms. Schafmeister explained that she obviously would not

be able to attend such a meeting given the pending criminal charges and order of protection.  She

wrote:

> I have made repeated complaints about Dr. Kennedy's erratic,
> harassing and threatening behavior. I explained to you that I had a
> past relationship with him, and that he began harassing me at work
> because I ended my personal relationship with him.  I showed you
> evidence that he has had detectives follow me around, recorded my
> conversations and threatened witnesses.  I also told you that his
> behavior towards me and his own work has put the health and safety
> of our patients at risk.  I said that Dr. Kennedy repeatedly threatened
> to have me arrested on false charges of embezzlement if I did not
> comply with his demands and withdraw my HR complaint.
>
> You and NYU have done literally nothing to assist me in response
> to my complaints.  I was forced to continue to go to work with Dr.
> Kennedy, despite the fact that you were fully on notice of his
> discriminatory, retaliatory and downright frightening behavior.
> Yesterday, as I predicted and told you, I was arrested on bogus
> charges of embezzlement.  The judge also issued a restraining order,
> and I cannot come to NYU without violating it.  I also cannot discuss
> this matter with you given the pending criminal charges.  I will
> follow up as soon as I can.
>
> I truly believe this all could have been avoided if you had simply
> properly responded to my complaints.

110.    Incredibly, Ms. Pacina, who is not a lawyer, never mind a criminal defense

lawyer, responded by attempting to convince Ms. Schafmeister to attend the meeting despite Ms.

Schafmeister's email and explanation.

111.    On November 25, 2019, Ms. Schafmeister put NYU Langone on notice of her

decision to retain counsel.  Ms. Schafmeister's attorneys, Wigdor, again explained to NYU

Langone that Ms. Schafmeister could not sit for an interview.  Although Ms. Schafmeister was

able to have the order of protection modified such that she could return to work, she could not sit

for an interview given the pending criminal charges.

112.    Wigdor also explained that Ms. Schafmeister had already provided ample evidence and would be happy to respond to written questions directed through counsel.

113.    Despite this overture, NYU Langone, intent on continuing to harass Ms. Schafmeister, contacted her directly to attempt to set up another interview.

114.    When Wigdor again explained that this would not be possible, HR sent Ms. Schafmeister written questions **and told her that she was not permitted to consult counsel in responding to them.** Many of the questions were incredibly inappropriate, including asking for the dates and locations of certain times Ms. Schafmeister had been "intimate" with Dr. Kennedy.

115.    Finally, since returning to work, Ms. Schafmeister learned that her job description had been changed and she was stripped of all of her managerial responsibilities.

116.    This change in position was clearly an act of retaliation against Ms. Schafmeister for having the courage to bring forth her complaints of discrimination.

### FIRST CAUSE OF ACTION
**(Discrimination in Violation of Title IX)**
*Against Defendant NYU Langone Hospitals*

117.    Plaintiff repeats and re-alleges each and every allegation in the preceding paragraphs, as though fully set forth herein.

118.    Title IX of the Education Amendments Act of 1972 states, "No person in the United States shall on the basis of sex, be … subject to discrimination under any education program or activity receiving Federal financial assistance."

119.    By the above described conduct, Plaintiff was discriminated against on the basis of her sex at Defendant NYU Langone Hospitals by denying Plaintiff the same terms and conditions of employment available to others based on her gender and her unwillingness to maintain an intimate relationship with Dr. Kennedy, including, but not limited to, by subjecting

her to heightened scrutiny, subjecting her to harassment (including having her followed by private detectives and spying on her conversations), threatening to terminate her employment, threatening to have her arrested and deported and actually having her arrested and charged with a felony.

120.    By the above-described conduct, Defendant NYU Langone Hospitals was on notice of the discriminatory conduct engaged in by faculty at the Hospital.  Defendant NYU Langone Hospitals failed to carry out its duties and obligations pursuant to Title IX to investigate and take corrective action.

121.    By the above-described conduct, Defendant NYU Langone Hospitals allowed and fostered an educational environment in which discriminatory and harassing practices were, and continue to be, sufficiently severe or pervasive to create an environment that is both subjectively and objectively hostile, abusive and retaliatory.

122.    By the above-described conduct, Defendant NYU Langone Hospitals tolerated, condoned, ratified and/or engaged in the sexually abusive educational environment, or, in the alternative, knew, or should have known, of its existence, yet failed to conduct proper investigations and failed to take remedial action.

123.    By reason of the continuous and ongoing nature of the above-described sexual harassment and sexual discrimination, Plaintiff is entitled to the application of the continuing violation doctrine to the unlawful acts alleged herein.

124.    As a direct and proximate result of Defendant NYU Langone Hospitals' unlawful actions or inactions, Plaintiff has suffered, and will continue to suffer, harm, including, but not limited to, loss of future educational and employment opportunities, humiliation, embarrassment,

reputational harm, emotional and physical distress, mental anguish and other economic damages and non-economic damages.

125.    Plaintiff is entitled to all legal and equitable remedies available for violations of Title IX, including compensatory damages, attorneys' fees and costs and other appropriate relief.

## SECOND CAUSE OF ACTION
### (Retaliation in Violation of Title IX)
### *Against Defendant NYU Langone Hospitals*

126.    Plaintiff repeats and re-alleges each and every allegation in the preceding paragraphs, as though fully set forth herein.

127.    By the above described conduct, Defendant NYU Langone Hospitals has retaliated against Plaintiff in violation of Title IX by, *inter alia*, including, but not limited to, subjecting her to heightened scrutiny, subjecting her to harassment (including having her followed by private detectives and spying on her conversations), threatening to terminate her employment, threatening to have her arrested and deported and actually having her arrested and charged with a felony, failing to properly investigate her claims of discrimination and instigating retaliatory investigation practices.

128.    As a direct and proximate result of Defendant NYU Langone Hospitals' unlawful conduct in violation of Title IX, Plaintiff has suffered, and continues to suffer, harm for which she is entitled to an award of damages to the greatest extent permitted by law, including, but not limited to, monetary and/or economic harm, for which she is entitled to an award of monetary damages.

129.    As a direct and proximate result of Defendant NYU Langone Hospitals' unlawful actions, Plaintiff has suffered, and will continue to suffer, harm, including, but not limited to, loss of future educational and employment opportunities, humiliation, embarrassment,

reputational harm, emotional and physical distress, mental anguish and other economic damages and non-economic damages.

130.    Plaintiff is entitled to all legal and equitable remedies available for violations of Title IX, including compensatory damages, attorneys' fees and costs and other appropriate relief.

**THIRD CAUSE OF ACTION**
**(Discrimination in Violation of the NYSHRL)**
***Against All Defendants***

131.    Plaintiff repeats and re-alleges each and every allegation in the preceding paragraphs, as though fully set forth herein.

132.    By the actions described above, among others, Defendants discriminated against Plaintiff on the basis of her gender in violation of the NYSHRL by subjecting her to disparate treatment based upon her gender and her unwillingness to maintain an intimate relationship with Dr. Kennedy, including, but not limited to, subjecting her to heightened scrutiny, subjecting her to harassment (including having her followed by private detectives and spying on her conversations), threatening to terminate her employment, threatening to have her arrested and deported and actually having her arrested and charged with a felony.

133.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct, Plaintiff has suffered, and continues to suffer, harm for which she is entitled to an award of monetary damages and other relief.

134.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct, Plaintiff has suffered, and continues to suffer, severe physical injury, pain, ailments and conditions, as well as mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-

confidence and other emotional pain and suffering, for which she is entitled to an award of

compensatory damages and other relief.

135.    Defendants' unlawful and discriminatory actions constitute malicious, willful and

wanton violations of the New York State Human Rights Law, for which Plaintiff is further

entitled to an award of punitive damages.

## FOURTH CAUSE OF ACTION
### (Retaliation in Violation of the NYSHRL)
### *Against All Defendants*

136.    Plaintiff repeats and re-alleges each and every allegation in the preceding

paragraphs, as though fully set forth herein.

137.    By the actions described above, among others, Defendants retaliated against

Plaintiff on the basis of her complaints of discrimination by, *inter alia*, subjecting her to

heightened scrutiny, subjecting her to harassment (including having her followed by private

detectives and spying on her conversations), threatening to terminate her employment,

threatening to have her arrested and deported and actually having her arrested and charged with a

felony, failing to properly investigate her claims of discrimination and instigating retaliatory

investigation practices.

138.    As a direct and proximate result of Defendants' unlawful and retaliatory conduct,

Plaintiff has suffered, and continues to suffer, harm for which she is entitled to an award of

monetary damages and other relief.

139.     As a direct and proximate result of Defendants' unlawful and retaliatory conduct,

Plaintiff has suffered, and continues to suffer, severe physical injury, pain, ailments, and

conditions, as well as mental anguish and emotional distress, including, but not limited to,

depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-

confidence and other emotional pain and suffering, for which she is entitled to an award of compensatory damages and other relief.

140.    Defendants' unlawful and retaliatory actions constitute malicious, willful and wanton violations of the New York State Human Rights Law, for which Plaintiff is further entitled to an award of punitive damages.

**FIFTH CAUSE OF ACTION**
**(Discrimination in Violation of the NYCHRL)**
***Against All Defendants***

141.    Plaintiff repeats and re-alleges each and every allegation in the preceding paragraphs, as though fully set forth herein.

142.    By the actions described above, among others, Defendants discriminated against Plaintiff on the basis of her gender in violation of the NYCHRL by subjecting her to disparate treatment based upon her gender and her unwillingness to maintain an intimate relationship with Dr. Kennedy, including, but not limited to, subjecting her to heightened scrutiny, subjecting her to harassment (including having her followed by private detectives and spying on her conversations), threatening to terminate her employment, threatening to have her arrested and deported and actually having her arrested and charged with a felony.

143.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct, Plaintiff has suffered, and continues to suffer, harm for which she is entitled to an award of monetary damages and other relief.

144.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct, Plaintiff has suffered, and continues to suffer, severe physical injury, pain, ailments, and conditions, as well as mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-

confidence and other emotional pain and suffering, for which she is entitled to an award of compensatory damages and other relief.

145.    Defendants' unlawful and discriminatory actions constitute malicious, willful and wanton violations of the New York City Human Rights Law, for which Plaintiff is further entitled to an award of punitive damages.

**SIXTH CAUSE OF ACTION**
**(Retaliation in Violation of the NYCHRL)**
***Against All Defendants***

146.    Plaintiff repeats and re-alleges each and every allegation in the preceding paragraphs, as though fully set forth herein.

147.    By the actions described above, among others, Defendants retaliated against Plaintiff on the basis of her complaints of discrimination by, *inter alia*, subjecting her to heightened scrutiny, subjecting her to harassment (including having her followed by private detectives and spying on her conversations), threatening to terminate her employment, threatening to have her arrested and deported and actually having her arrested and charged with a felony, failing to properly investigate her claims of discrimination and instigating retaliatory investigation practices.

148.    As a direct and proximate result of Defendants' unlawful and retaliatory conduct, Plaintiff has suffered, and continues to suffer, harm for which she is entitled to an award of monetary damages and other relief.

149.    As a direct and proximate result of Defendants' unlawful and retaliatory conduct, Plaintiff has suffered, and continues to suffer, severe physical injury, pain, ailments, and conditions, as well as mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-

confidence and other emotional pain and suffering, for which she is entitled to an award of compensatory damages and other relief.

150.    Defendants' unlawful and retaliatory actions constitute malicious, willful and wanton violations of the New York City Human Rights Law, for which Plaintiff is further entitled to an award of punitive damages.

## SEVENTH CAUSE OF ACTION
### (Intentional Infliction of Emotional Distress)
### *Against Defendant Kennedy*

151.    Plaintiff hereby repeats and re-alleges each and every allegation in the preceding paragraphs, as though set forth fully herein.

152.    Defendant Kennedy engaged in conduct toward Plaintiff that was extreme and outrageous so as to exceed the bounds of decency in a civilized society; namely by, *inter alia*, subjecting her to heightened scrutiny, subjecting her to harassment (including having her followed by private detectives and spying on her conversations), threatening to terminate her employment, threatening to have her arrested and deported and actually having her arrested and charged with a felony, instigating the issuance of an order of protection against Ms. Schafmeister and attempting to silence and intimidate corroborating witnesses.

153.    These actions were taken with intent to cause, or disregard for the substantial probability of causing, severe emotional distress.

154.    As a direct and proximate result of Defendant Kennedy's extreme and outrageous conduct, Plaintiff has suffered severe emotional distress.

155.    Defendant Kennedy's conduct was wanton, malicious, willful and/or cruel, entitling Plaintiff to an award of punitive damages.

## EIGHTH CAUSE OF ACTION
### (Defamation *per se*)
### *Against Defendant Kennedy*

156.    Plaintiff hereby repeats and re-alleges each and every allegation in the preceding paragraphs, as though fully set forth herein.

157.    Defendant Kennedy has provided false information regarding, *inter alia*, accusations that Plaintiff committed a crime, including, but not limited to, embezzlement.

158.    These statements were untrue and defamatory in that they falsely reported Plaintiff's professional character, actions and statements, and were made with the intent to harm Plaintiff professionally.

159.    Defendant Kennedy knew or should have known that such defamatory statements were false.

160.    Defendant Kennedy made such defamatory statements with knowledge of their falsity and/or with a reckless disregard for their truth or falsity.

161.    Defendant Kennedy's statements constitute defamation because they impugn Ms. Schafmeister's honesty, trustworthiness, dependability and professional fitness and abilities by falsely accusing her of committing a crime that would tend to injure her in her trade or business.

162.    Defendant Kennedy's defamatory statements have harmed Plaintiff's professional reputation and standing in her industry, have caused her economic harm, have caused her to incur special damages in the form of actual pecuniary loss, including lost benefits, job security and opportunities for career advancement, and have caused her embarrassment, humiliation and emotional injury.

163.    As a direct and proximate result of Defendant Kennedy's defamation, Plaintiff has suffered, and continues to suffer, from loss of freedom, humiliation, loss of standing in the community, loss of self-esteem and public esteem, public disgrace and emotional distress.

164.     As a direct and proximate result of Defendant Kennedy's conduct, Plaintiff has

suffered, and continues to suffer, harm for which she is entitled to an award of monetary

damages and other relief.

165.     Defendant Kennedy's defamatory statements were malicious, willful, wanton and

done with reckless disregard for Plaintiff's rights.  As such, Plaintiff is entitled to an award of

punitive damages.

### NINTH CAUSE OF ACTION
**(Promissory Estoppel)**
***Against Defendant Kennedy***

166.      Plaintiff hereby repeats and re-alleges each and every allegation in the preceding

paragraphs, as though fully set forth herein.

167.     Defendant promised Plaintiff that if she paid him for the down payment and

monthly mortgage and maintenance payments, Dr. Kennedy would permit Plaintiff to live in the

Mercer Street Apartment and would transfer title to her when the mortgage was paid off.

168.     Plaintiff reasonably relied on Defendant's promise by, *inter alia*, paying

Defendant Kennedy over $80,000 the down payment, as well as monthly mortgage and

maintenance payments totaling approximately $150,000.

169.     Defendant Kennedy failed to act in accordance with his promise by threatening to

evict Plaintiff and refusing Plaintiff's request that he return her payments.

170.     As a direct and proximate result of Defendant's failure to act in accordance with

their promise, Plaintiff has suffered, and continues to suffer, economic harm for which she is

entitled to an award of damages to the greatest extent permitted under law.

## TENTH CAUSE OF ACTION
### (Breach of Contract)
### *Against All Defendants*

171.     Plaintiff hereby repeats and re-alleges each and every allegation in the preceding paragraphs, as though fully set forth herein.

172.     Defendants agreed to pay Ms. Schafmeister a bonus of $20,000, which they told Ms. Schafmeister would be approximately $14,000 after taxes, in exchange for her work. Defendants failed to pay this bonus.

173.     As a direct and proximate result of Defendants' failure to act in accordance with their promise, Plaintiff has suffered, and continues to suffer, economic harm for which she is entitled to an award of damages to the greatest extent permitted under law

## ELEVENTH CAUSE OF ACTION
### (Violation of New York Labor Law § 193)
### *Against All Defendants*

174.     Plaintiff hereby repeats and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

175.     NYLL § 193 prohibits covered employers, such as Defendants, from making unauthorized deductions from the wages of any employee.

176.     The $20,000 bonus due to Plaintiff constitutes "wages" as defined in NYLL § 190(1).

177.     By failing to pay Plaintiff her $20,000 bonus, Defendants made unlawful deductions and withholdings from Plaintiff's wages.

178.     As a result of Defendants' willful and unlawful conduct, Plaintiff is entitled to an award of damages in an amount to be determined at trial, plus liquidated damages, prejudgment interest and reasonable attorneys' fees and costs.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that the Court enter judgment in her favor and against Defendants, containing the following relief:

A.      A declaratory judgment that the actions, conduct and practices of Defendants complained of herein violate the laws of the United States, the State of New York and the City of New York;

B.      An injunction and order permanently restraining Defendants from engaging in such unlawful conduct;

C.      Reinstatement to the position Plaintiff held prior to the conduct described herein;

D.      An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic harm; for harm to her professional and personal reputation and loss of career fulfillment; for all non-monetary and/or compensatory harm, including, but not limited to, compensation for physical injury, emotional distress and mental anguish; and all other monetary and/or non-monetary losses suffered by Plaintiff;

E.      An award of punitive damages;

F.      An award of liquidated damages to the fullest extent permitted by law;

G.      An award of costs that Plaintiff has incurred in this action, as well as Plaintiff's reasonable attorneys' fees and expenses to the fullest extent permitted by law; and

Such other and further relief as Plaintiff may be entitled to under law, and/or which the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated: December 27, 2019
New York, New York

Respectfully submitted,

**WIGDOR LLP**

By: _____

Michael J. Willemin
Hilary J. Orzick

85 Fifth Avenue
New York, NY  10003
Telephone:  (212) 257-6800
Facsimile:   (212) 257-6845
mwillemin@wigdorlaw.com
horzick@wigdorlaw.com

*Counsel for Plaintiff*